UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>                    Plaintiff, | 1:95-CV-05346-OWW SMS |
| <br>     v. | <br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |
| GLENN D. BELL, JEANETTE BELL,<br>et al.<br>                    Defendants. | |

     This case came before the Court for trial commencing April 25, 2008, in Courtroom 3, the Hon. Oliver W. Wanger presiding. The Court heard evidence during a one-day bench trial.  The parties submitted trial briefs and proposed Findings of Fact and Conclusions of Law.  Plaintiff United States ("US" or "the United States") is represented by G. Patrick Jennings of the U.S. Department of Justice.  Defendant Dumas International, LLC ("Dumas") is represented by Frank T. Zumalt, of The Zumalt Law Firm, APC.  After hearing all the evidence, legal submissions and arguments of the parties, the following Findings of Fact and Conclusions of Law are entered.

PRELIMINARY MATTERS

A.   <u>LEGAL STANDARD</u>

     In trials without juries, Fed. R. Civ. P. 52(a) requires a court to find the facts specially and state separately its conclusions of law thereon.  *See Barnett v. Sea Land Service*, 875 F.2d 741, 744 (9th Cir. 1989).  Even upon review, due regard is given to the district court's judgment as to the credibility of

1

the witnesses, Fed. R. Civ. P. 52(a) and Courts of Appeal will give deference to a district court's choice between two permissible views of evidence provided it is not clearly erroneous.  *Moody v. Proctor*, 986 F.2d 239, 241 (8th Cir. 1993).

B.   **EVIDENCE**

The following exhibits were admitted into evidence during trial:

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 1 | Declaration of Darrell Souza, on behalf of Dumas, Dated 6/12/2005 |
| 2 | Loan Purchase and Sale Agreement, Dated 12/10/2003 |
| 3 | Adjustable Rate Note, Dated 8/9/1984 |
| 4 | Deed of Trust, Dated 8/9/1984 |
| 5 | Guaranty Residential Lending Payoff Statement, Dated 10/23/2003 |
| 6 | Two Residential Mortgage Loan Statements, Dated 12/9/2003, Loan No. 72888-000527-001 and Dated 12/15/2003, Loan No. 72888-000527-001 ADV |
| 7 | Jeanette Bell Bankruptcy Petition, Dated 3/10/2006 |
| 8 | Tentative Ruling from Bankruptcy Court, Dated 12/27/1999 |
| 9 | Portions of Deposition of Stockton Savings Employee, Kathryn Irene Lewis, Dated 9/18/1996 |
| 10 | Guaranty Bank Letter of Assignment to the Bells, Dated 12/15/2003 |
| 11 | Notice of Sale, Dated 12/18/2003 |
| 12 | Notice of Sale, Dated 12/30/2003 |
| 13 | Dumas's Calculation of Mortgage Balance |
| 14 | Letter from Souza to Jennings, Dated 3/12/2004 |
| 15 | Letter from Souza to Jennings, Dated 12/23/2004 |
| 16 | Notices of Federal Tax Lien, Earliest Date 2/10/1989 |
| 17 | US Calculation of Mortgage Balance |

| | |
|---|---|
| 18a | Individual Joint Tenancy, Dated 3/19/1984 |
| 18b | Deed of Trust, Dated 3/19/1984 |
| 19 | Voluntary Petition for Bankruptcy, Dated 12/13/1999 |
| 20 | Residential Mortgage Statement, Dated 12/9/2003, Loan No. 1036207 |
| 21 | Guaranty Bank Letter of Assignment to the Bells, and Guaranty Bank envelope addressed to Mr. Souza, Dated 12/15/2003 |
| 22 | Residential Mortgage Statement, Dated 12/15/2003, Loan No. 1036207ADV |
| 23 | Notice of Sale, Dated 12/18/2003 |
| 24 | Notice of Sale, Dated 12/30/2003 |
| 25a | Judicial Notice of Sale, Dated 3/7/2007 |
| 25b | Judicial Notice of Sale (Internet Version ), Dated 3/7/2007 |
| 26 | Affidavit of Death of Glen Bell, Joint Tenant, Dated 1/24/2007 |
| 27 | Letters to Guaranty Bank from Darrell Souza |
| 28 | Letter to Souza from U.S. Department of Justice, Dated 4/1/2004 |
| 29 | Letter to U.S. Department of Justice from Souza, Dated 4/14/2004 |
| 30 | Letter to Souza from U.S. Department of Justice, Dated 5/25/2004 |
| 31 | Letter to U.S. Department of Justice from Souza, Dated 12/23/2004 |
| 32 | Letter of Acceptance to Souza from U.S. Department of Justice, Dated 9/9/2005 |
| 33 | Notice of Entry of Order of Dismissal, Dated 11/17/2006 |
| 34 | Bankruptcy Proof of Claim, Dated 6/12/2006 |
| 35 | Separate Release of Funds and Sale Agreement, Dated 1/24/2007 |
| 36 | Letter to U.S. Department of Justice from Souza, Dated 2/21/2007 |
| 37 | Report of Richard L. Goldstein, Dated 4/18/2008 |

3

1              **FINDINGS OF FACT**

2        **To the extent that any Findings of Fact can be interpreted**

3  **as a Conclusion of Law, it is intended.**

4  **A.    THE PARTIES**

5        **1.   Plaintiff is the United States of America, or the US.**

6  **The US filed this action to reduce a tax assessment to judgment**

7  **and to enforce tax liens against real property, known as the Bell**

8  **Ranch.**

9        **2.   Defendant Dumas International LLC, is a Delaware limited**

10  **liability company, with its principal place of business in**

11  **Modesto, California.  Ron Malleck, is the principal of Dumas.**

12        **3.   Dumas is in the business of purchasing "troubled"**

13  **properties — those with outstanding liens or other**

14  **defective-title problems — and clearing up those problems, and**

15  **then re-selling the properties.  Dumas becomes the owner of these**

16  **distressed properties, with the intent to clear the problems**

17  **associated with the properties and to later sell the properties**

18  **at a profit.**

19        **4.   Darrell Souza, is a managing member of Dumas who**

20  **negotiated the purchase of the Deed of Trust from Guaranty**

21  **Federal Bank ("Guaranty Bank"), successor-in-interest to Stockton**

22  **Savings and Loan Association, a Federal Savings and Loan**

23  **Association ("Stockton Savings").  He is a commercial real estate**

24  **broker and so licensed in California.**

25        **5.   Mr. Souza previously owned a real estate company, J Bar,**

26  **from 1989 through 1996.  During the course of Mr. Souza's**

27  **experience as a realtor, he has dealt with mortgage loans and**

28  **deeds of trust and familiarized himself with lienholders and**

**4**

1   their interests.  He has acquired deeds of trust from banks from
2   1982 to the present time.

3       6.  Mr. Souza has participated in judicial sales, such as
4   probate sales, but had not participated in an IRS sale prior to
5   the Bell Ranch judicial sale.

6       7.  Dumas disputes the balance due under the Adjustable Rate
7   Note and Deed of Trust owed by the judgment debtors, Glen and
8   Jeanette Bell, which is senior in priority to the tax liens, as
9   to the original loan amount and interest and penalties thereon.

10      8.  Guaranty Bank was the previous holder of the Adjustable
11  Rate Note and Deed of Trust, and the successor to the original
12  Defendant to this suit, Stockton Savings.

13      9.  Glen D. Bell and Jeanette Bell (the "Bells"), defendants
14  and taxpayers, were legal owners of the Bell Ranch, having
15  obtained legal title on May 1, 1984 from Paul and Rose Warda.
16  The Bells paid $350,000 for the entire property and then
17  constructed a residence on parcel A, 3549 Kiernan Road.  *United*
18  *States v. Bell*, 27 F.Supp.2d 1191, 1195 (E.D. Cal. 1998); 4/24
19  Tr. Transcript 106:20-23.

20      I.  Bell Ranch

21      10.  The "Bell Ranch" is commonly known as 3549 Kiernan
22  Road, Modesto, California, APN 003-19-13-803; 3513 Kiernan Road &
23  3513 ½ Kiernan Road, APN 003-19-14-803 and APN 003-19-15-807.
24  The property has 29.233 acres in the County of Stanislaus, State
25  of California.  The acreage is divided into parcels A, B, and C,
26  and is more particularly described as follows:

27              PARCELS "A", "B", AND "C", AS SHOWN AND DESIGNATED ON
                THAT CERTAIN PARCEL MAP FILED APRIL 26, 1984 IN VOLUME
28              35 OF PARCEL MAPS, AT PAGE 18, BEING A DIVISION OF LOTS

                              **5**

> **9, 10, 15, AND 16 OF EDEN COLONY ACCORDING TO THE OFFICIAL MAP THEREOF, FILED IN THE OFFICE OF THE RECORDER OF STANISLAUS COUNTY, CALIFORNIA ON AUGUST 14, 1909 IN VOLUME 4 OF MAPS, AT PAGE 32.**

11.  The large residence, located at 3549 Kiernan Road, parcel A, was constructed on the property following the Bells' purchase.  *Id.*  The two other houses on the Bell Ranch are older and have little value.

12.  Mr. Souza first became aware of the Bell Ranch through a 2001 public auction of the property, a judicial or tax sale, that was noticed in the newspaper and the internet.

**B.**  **CONSTRUCTION LOAN- ADJUSTABLE RATE NOTE (AUGUST 1984)**

13.  The Bells obtained a construction loan from Stockton Savings in the amount of $251,000 in 1984 to construct a home on parcel A, 3549 Kiernan Road.

14.  An adjustable rate note ("Adjustable Rate Note") dated August 9, 1984, evidenced the construction loan, in the principal amount of $310,000.  *United States v. Bell*, 27 F.Supp.2d 1191, 1195 (E.D. Cal. 1998).  Dumas is the current holder of the Adjustable Rate Note.

15.  The Adjustable Rate Note matures in 2015.

16.  The Adjustable Rate Note for Loan No. 72888-000527-001, bearing the signatures of Glen Bell and Jeanette Bell, provides for an interest rate 2.25 percentage points above the "monthly weighted average cost of funds index for Eleventh District Savings and Loan Associations."  Ex. 3.

17.  A note has not been located that references Loan No. 72888-000527-001 ADV, which Dumas contends refers to an advance loan on the construction loan.  No checks evidencing payment on

6

an advance have been located.   4/24 Tr. Transcript 118:14-16.

18.   Many of the loan documents appear to have been misplaced in the transitions that have occurred since Stockton Savings was acquired by Guaranty Bank.

19.   The only promissory note provided in evidence that references the Deed of Trust, is the Adjustable Rate Note, Exhibit 3.   4/25 Trial Tr. 100:21-25; 101:1-3; 107:18-20; Ex. 3, Adjustable Rate Note.

20.   Both parties assume that the Bells stopped paying on the construction loan after 1998 to date.

C.   DEED OF TRUST (AUGUST 1984)

21.   In conjunction with the construction loan and Adjustable Rate Note, the Bells granted a first deed of trust interest in Parcel A of the real property to Stockton Savings, as trustee for Stockton Federal Savings and Loan Association ("Deed of Trust").   Ex. 4, Deed of Trust.

22.   The Deed of Trust was dated August 9, 1984, executed by the Bells, and recorded in the Official Records of Stanislaus County, California on August 15, 1984, as Instrument No. 7773.

23.   This Deed of Trust recites that the Bell Ranch, parcel A, and easement over parcel C, has been encumbered as security for a $310,000 construction loan.

I.   FUTURE ADVANCES

24.   Paragraph 21 of the Deed of Trust allows for future advances at the option of the lender: As "repayment of any future advances, with interest thereon, made to Borrower by Lender pursuant to paragraph 21 hereof (herein "future advances")."   Ex. 4.

1    **25.   The Deed of Trust provides that such future advances,**

2    **with interest, shall be secured by the Deed of Trust <u>when</u>**

3    **<u>evidenced by promissory notes</u>.   Ex. 4, ¶ 21, Future Advances.**

4        **26.   Paragraph 21 states:**

5            **Upon request of Borrower, Lender, at Lender's option,**
             **prior to reconveyance of the property to Borrower, may**

6            **make Future Advances to Borrower.   Such Future**
             **Advances, together with interest thereon, shall be**

7            **secured by this deed of trust when evidenced by**
             **promissory notes stating that said notes are secured**

8            **hereby.**

9        **27.   To the extent that it secures the repayment of the**

10   **construction loan to the Bells, the Deed of Trust is senior in**

11   **lien priority to the federal tax liens against the property of**

12   **defendants the Bells.   *United States v. Bell*, 27 F.Supp.2d 1191,**

13   **1200 (E.D. Cal. 1998).**

14   **D.   <u>THE BELL'S BANKRUPTCIES/TITLE TRANSFERS (1985-1987)</u>**

15       **28.   Through a variety of stratagems, including multiple**

16   **bankruptcy filings, and fraudulent transfers, the Bells delayed**

17   **and frustrated efforts by the IRS to collect taxes owed by the**

18   **Bells to the United States Government.   These activities are**

19   **described, in part, in *United States v. Bell*, 27 F. Supp. 2d**

20   **1191, 1193-1197 (E.D. Cal. 1998).**

21       **29.   The Bells made transfers of the Bell Ranch beginning**

22   **less than one year after their purchase in August, 1984.**

23       **(1)   On June 12, 1985, the Bells deeded the Bell Ranch to**

24            **"Glen D. Bell and Jeanette Bell as trustees of the Glen**

25            **D. Bell Family Trust."   *Id.* at 1195.**

26       **(2)   On September 25, 1985, Glen D. Bell recorded a "paper**

27            **mortgage" to an entity he invented, the "International**

28            **Bank of the South Pacific" in the amount of $300,000.**

**8**

*Id.*

   **(3)**   **On May 27, 1986, the Bells as trustees transferred title to the Bell Ranch to the "Racine Trust."** *Id.*

   **(4)**   **On December 9, 1987, the Bells transferred the Bell Ranch from Racine Trust to the Stark Management Company.** *Id.*[1]

**E.**   **FEDERAL TAX LIENS (FEBRUARY 1989)**

   **30.**   **The earliest federal tax lien attached to the property on June 29, 1987, by operation of law.  Doc. 103, Judgment. Numerous notices of federal tax lien for various tax assessments were subsequently filed with the Stanislaus County Recorder, the earliest being February 10, 1989.  Ex. 16, Notices of Federal Tax Liens.**

**F.**   **WARDA NOTE PAID (MARCH 1989)**

   **31.**   **A promissory note, existed, representing money owed to the previous owners, the Wardas.  By March 19, 1989, the Warda note, secured by a deed of trust, which attached to all three parcels, A, B, and C, was satisfied by the Bells.**

**G.**   **DEPOSITION OF KATHRYN LEWIS, STOCKTON SAVINGS BANK (SEPTEMBER 1996)**

   **32.**   **Kathryn I. Lewis, a Stockton Savings Bank employee, was deposed on September 18, 1996.  Ex. 9, Depo. Kathryn I. Lewis, Dated September 18, 1996.**

   **33.**   **She began working for Stockton Savings in June 1990 or 1991.  Ex. 9, Depo. Lewis 59:3-6.**

---

[1] **The Court held that a nominee relationship existed between the Bells and Stark Management Company and permitted the enforcement of the tax liens against the Bell Ranch.** *United States v. Bell*, **27 F.Supp.2d at 1201.**

34.   In her deposition, she testified that there are five people in her department.  The work on delinquent accounts is divided monthly, based on delinquency.  Mr. Bell and his delinquent account may have been worked on by another collector in the company.  Employees do not keep the delinquent account for the course of the loan.  Ex. 9, Depo. Lewis, 59:15-60:3.

35.   Ms. Lewis testified that the Bells were in default on the loan in 1994, but believes the default was later cured.  Ex. 9, Depo. Lewis, 77:2-21.  She testified that the principal loan balance as of August, 1996, was $267,429.05.

H.   TAX JUDGMENTS (OCTOBER 1998)

36.   On October 23, 1998, the Court in this case reduced to judgment the tax assessments at issue against Glen D. Bell in the amount of $2,680,283.30, plus interest, and against Jeanette Bell the amount of $1,022,865.20, plus interest, calculated according to law.  The combined judgments total $3,703,148.50.  Doc. 103, Judgment.

I.   BANKRUPTCY COURT TENTATIVE RULING (DECEMBER 1999)

37.   Judge McManus' tentative ruling in the Bells' bankruptcy proceedings, filed in 1999, refers to the Bells' bankruptcy schedules which state that their property "is encumbered by a first deed of trust securing a claim of $251,113.00."  Ex. 8, Tentative Ruling from Bankruptcy Court, Dated 12/27/1999, US 050.

J.   FAILED JUDICIAL SALE OF BELL RANCH (2001)

38.   A judicial sale of the Bell Ranch property was conducted pursuant to court order in 2001.  In the 2001 judicial sale, Mr. Mattos was the successful bidder for the property.  He

10

bid $770,000.   Dumas also bid in that auction, but stopped
bidding after the bid reached $760,000.

39.   Mr. Mattos did not complete the purchase of the Bell
Ranch.   He concluded that Glen Bell and Jeanette Bell had left
the condition of title to the property so clouded and tangled
that it was doubtful he could ever get clear title.

40.   Mr. Souza then commenced efforts to obtain Bell Ranch,
in consultation with Attorney Patrick Jennings (who handled the
Bell tax litigation for the Government), of the Treasury
Department, and IRS personnel.

41.   Mr. Souza decided the first step to acquiring Bell
Ranch was to fix the title and loans.   Mr. Souza decided to
purchase the Adjustable Rate Note issued for the construction
loan, at a discount from Stockton Savings.   Mr. Souza discussed
this with Mr. Jennings.

K.   GUARANTY PAYOFF STATEMENT (OCTOBER 2003)

42.   A payoff statement, a document provided by Guaranty
Bank, from Guaranty Residential Lending, Inc., dated October 23,
2003, states that the unpaid principal balance as of November 1,
1998, is $251,112.49.   The total due with interest and penalties
is stated as $384,925.59.   That figure closely matches the amount
listed as the amount due ($384,907.59) in the Loan Purchase and
Sale Agreement entered, into by Dumas and Guaranty Bank, when
Dumas bought the Deed of Trust and Adjustable Rate Note in 2003
for $260,000.   Ex. 2, Loan Purchase and Sale Agreement.

L.   GUARANTY TWO (2) MORTGAGE STATEMENT – DECEMBER 9 & 15, 2003

43.   Two separately dated residential mortgage loan
statements from December 2003 related to the Bells and the Bell

11

1    Ranch, were produced by Dumas during discovery.  Ex. 6.

2        I.    LOAN STMT - DECEMBER 9, 2003, LOAN NO.72888-000527-001

3        44.   The first mortgage statement is dated <u>December 9, 2003</u>,

4    referencing Loan No. 72888-000527-001.  The principal balance is

5    stated as $251,112.49, past-due balance is stated as $60,692, and

6    the interest rate is stated as 4.375%.  Ex. 6.  The statement is

7    addressed to the Bells main residence, 3549 Kiernan Ave.

8        II.   LOAN STMT - DECEMBER 15, 2003, LOAN NO.72888-000527-001
             ADV

9        45.   The second mortgage statement is dated <u>December 15,</u>

10   <u>2003</u>, Loan No. 72888-000527-001 ADV, reflecting a principal

11   balance of approximately $328,726.76, past-due balance of

12   $462,862.85, and an interest rate of 10%.  This is addressed to

13   another residence on the Bell Ranch, 3513 Kiernan Avenue.

14       46   The second statement lists the "MONTHLY PAYMENTS" as

15   $462,862.85.  The second statement is the primary document which

16   Dumas argues is evidence of a loan advance.  Ex. 6 US 40.

17       47.   The mailing envelopes for these statements show that

18   Loan No. 72888-000527-001 ADV was serviced by a Guaranty Bank

19   office in Austin, Texas; and the other statement, for Loan No.

20   72888-000527-001 is serviced by a different Guaranty Bank office,

21   located in Dallas, Texas,

22       48.   Mr. Souza received the December 15, 2003 mortgage loan

23   statement from Mr. Bell and picked it up at the Bell Ranch.  4/25

24   Tr. Transcript 77:9-82:17; Exhibit 22.

25   M.   <u>LOAN PURCHASE AND SALE AGREEMENT (DECEMBER 2003)</u>

26       49.   Mr. Souza, on behalf of Dumas, negotiated at length to

27   acquire the Deed of Trust and Adjustable Rate Note from Guaranty

28

1 Bank, successor-in-interest to Stockton Savings.   On or about

2 December 10, 2003, Dumas paid, $260,000 to Guaranty Bank, to

3 acquire all of its rights in the Deed of Trust.   Ex. 2, Loan

4 Purchase and Sale Agreement; 4/25 Tr. Transcript 57-:20-21.

5   50.   Mr. Souza testified that Guaranty Bank was vague with

6 him about the total amount due, including the principal, but

7 assured him it was over $500,000.   4/24 Tr. Transcript 110:7-24

8   51.   On or about December 10, 2003, Guaranty Bank, as

9 successor-in-interest to Stockton Savings and Stockton Financial

10 Corporation, sold, transferred and assigned to Dumas all of

11 Guaranty Bank's right, title and interest in the Adjustable Rate

12 Note, dated August 9, 1984, in the original face amount of

13 $310,000.000.   The repayment of which was secured by the Deed of

14 Trust.   Ex. 2, Loan Purchase and Sale Agreement.

15   52.   The terms of the transaction are set forth in the Loan

16 Purchase and Sale Agreement, entered into on December 10, 2003,

17 between Guaranty Bank and Dumas ("Loan Purchase and Sale

18 Agreement").   Ex. 2, Loan Purchase and Sale Agreement.   The Loan

19 Purchase and Sale Agreement states the unpaid principal balance

20 as of November 1, 2003, in the amount of $251,112.49.   *Id.*, p. 1,

21 ¶ F.   The Loan Purchase and Sale Agreement states, the total due

22 on the construction loan with accruals as of November 1, 2003, is

23 $384,907.59.   There is no mention of an advance of funds beyond

24 the original loan in the Loan Purchase and Sale Agreement.

25   53.   Mr. Souza testified at trial that Dumas offered to

26 purchase the Adjustable Rate Note and the Deed of Trust from

27 Guaranty Bank, with offers spanning from $100,000 to $325,000,

28 believing the principal balance due was over $500,000, before

settling on an agreed upon payment of $260,000.

54.   Dumas paid $260,000 to Guaranty Bank for the Adjustable Rate Note and Deed of Trust.  Mr. Souza testified that the reason for the lower purchase price, was because Dumas wanted to pay approximately 50% of the principal.

55.   Section 16 of the Loan Purchase and Sale Agreement, is an integration clause, stating the agreement is the entire agreement between the parties, superseding any other, and requiring any future modifications to be in writing.  Ex. 2, § 16.

56.   Mr. Souza testified that the Loan Purchase and Sale Agreement amount refers to the initial construction loan balance only and did not include the advance balance.  4/25 Tr. Transcript 58:1-59:7.

57.   Mr. Souza testified in response to questioning on why in the agreement the amount outstanding stated does not include the advance.  He stated that he was first provided the wiring instructions for the funds, he then wired the funds, and only after wiring the funds did he receive from Mr. Nuss, of Guaranty Bank, the Loan Purchase and Sale Agreement to sign.  The agreement was prepared by Mr. Nuss, of Guaranty Bank.

58.   Mr. Souza asserted he would not have paid $260,000 for a loan in which the principal amount due was $251,000.  4/24 Tr. Transcript 127:12-19.

59.   Mr. Souza does not know when the advance loan was made. But due to the recorded tax lien, he believes Mr. Bell's ability to borrow was non-existent after the tax lien was recorded.  He testified that an advance must have been before the tax lien was

14

filed.  4/24 Tr. Transcript 104:2-11.

60.  Mr. Souza's testified that in his experience in attempting to qualify borrowers for loans, once a federal lien is in place, is that qualification for a loan is extremely difficult and rarely possible.  4/24 Tr. Transcript 128:11-129:7.

61.  Mr. Souza also testified in an earlier deposition that he thought the advance was made after the tax lien was filed in 1995 or 1996.  4/24 Tr. Transcript 104:12-25.

N.    NOTICE OF ASSIGNMENT (DECEMBER 15, 2003)

62.  On December 15, 2003, Guaranty Bank sent a letter to Glen Bell and Jeanette Bell.  Ex. 10, Guaranty Bank Letter of Assignment to the Bells.  It stated: "This is to notify you the above loan has been sold and assigned to Dumas International LLC. Please make the appropriate changes to your records.  You should be contacted by their representative(s) shortly."

63.  The loan number is referenced as: "GRL Loan No.: 0001036207 ADV."

64.  The property address referenced is: "Property Address: 3513 Kiernan Modesto CA 95356"

65.  Mr. Souza received this Guaranty Bank Letter of Assignment in a Guaranty Bank envelope, addressed to him.  Ex. 21, Guaranty Bank Letter of Assignment to Bells and Guaranty Bank envelope.  It is time-stamped December 19, 2003 and Mr. Souza testified he received it December 24, 2003 per the received stamp on the envelope.  *Id.*

O.    NOTICE(S) OF SALE OF ADJUSTABLE RATE NOTE AND DEED OF TRUST

66.  A Notice of Sale of an adjustable rate note and deed of trust from Guaranty Bank, is addressed to the Bells, December 18,

2003.  **Ex. 11, Notice, Dated 12/18/2003; Ex. 23, Notice, Dated 12/18/2003.  The Notice of Sale is from Eddie Register, Vice President, Guaranty Bank.  It states that Guaranty Bank sold, transferred and delivered to Dumas, an adjustable rate note, in the face amount of $310,000 and a deed of trust, encumbering the real property at 3549 Kiernan.**  *Id.*

67.  **Another Notice of Sale of an adjustable rate note and deed of trust is addressed to the Bells, from Guaranty Bank, dated December 30, 2003.  Ex. 24, Notice, Dated 12/30/2003.  The Notice of Sale is from Mary Ellen Orvis, Associate General Counsel, Guaranty Bank.  It states that the Guaranty Bank sold, transferred and delivered to Dumas an adjustable rate note in the face amount of $310,000 and a deed of trust, encumbering the real property at 3549 Kiernan.**  *Id.*

68.  **Mr. Souza testified at trial that he received both Notices through the mail.  He contends he received two notices for both the original loan and the advance.  4/24 Tr. Transcript 89:15-91:1.**

P.   **DUMAS'S OFFERS TO IRS**

69.  **Dumas, after its purchase of the Adjustable Rate Note and Deed of Trust, made a series of offers to the IRS to settle the Bells' tax liability.  Exs. 29 and 31.**

70.  **On March 12, 2004, Mr. Souza wrote an offer letter to G. Patrick Jennings of the U.S. Department of Justice.  Ex. 14, Letter from Souza to Jennings, Dated 3/12/2004.  The offer letter notifies Mr. Jennings, of the U.S. Department of Justice, that Dumas "acquired ownership of the first lien that encumbers the Bell Property..."  The letter states that the current balance**

owed is "approximately $451,000.00." *Id.* (emphasis added).

71. The letter also informs Mr. Jennings that Mr. Souza's client deposited $150,000 with First American Title to be paid to the IRS upon completion of the court ordered sale of the real property to his client. The letter ends with: "At this time they are willing to accept ownership and subject to the Bell's possession of the real property." *Id.*

72. Mr. Souza testified at trial that the amount of $451,000 was a discounted amount and was the principal amount only. He did not have the exact amount. He admits he did not call it a discounted amount in this letter. He states that he offered this amount to ensure the offer would provide for the government to receive some money. 4/24 Tr. Transcript 96:3-19. Mr. Souza testified that if a debtor owes delinquent interest, the interest will be written off to acquire the property. 4/24 Tr. Transcript 96:24-97:2.

73. Another offer letter, dated April 14, 2004, states: "My clients have deposited an additional $225,000 with First American Title, this brings the total amount they are willing to pay to the IRS $375,000.00 above the existing $451,000.000 first deed of trust."

74. Another offer letter, dated December 23, 2004, states: "My clients have deposited $375,000.00 with First American Title for payment to the Internal Revenue Service. This amount is over and above the existing first of approximately $472,000.00." Ex. 15 (emphasis added).

75. Dumas states that it has deposited $375,000 with First American Title. It also states thee deposited funds are payable

17

to the IRS, "upon completion of a court ordered sale of the [Bell Ranch] property to Dumas International."  Ex. 15.

Q.    Glen D. Bell, Deceased (DECEMBER 2004)

76.    On December 28, 2004, after a long illness (multiple sclerosis), Glen D. Bell died.  Ex. 26, Affidavit of Death of Glen Bell, Joint Tenant, Dated 1/24/2007.

R.    DARRELL SOUZA DECLARATION (JUNE 2005)

77.    On or about June 12, 2005, Mr. Souza, as managing member of Dumas, prepared and signed a declaration under penalty of perjury.  This declaration does not identify a loan advance in describing the principal balance.  Ex. 1, Souza Declaration.

78.    Paragraph 2(A) states: "The certain Adjustable Rate Note ("Note"), dated August 9, 1984, in the original face amount of $310,000.00 made in favor of Stockton Savings and Loan Association, a Federal Savings and Loan Association ("Stockton Savings")..."  Ex. 1, ¶ 2.

79.    The declaration states in paragraph 4: "Pursuant to the terms of the Note [August 9, 1984 Adjustable Rate Note], Rider and Deed of Trust the total amount outstanding thereunder as of June 30, 2005 is as follows: "Principal $251,112.49 ... Total as of 5/15/05 $482,956.74."  Ex. 1, ¶ 4; 4/25 Tr. Transcript 109:6-25, 110:1-19.

80.    The Declaration separately itemized the principal, interest, and accruals to the Deed of Trust, including late fees and escrow advances.

81.    Mr. Souza testified that the amount he provided in the declaration provides a discount to the US.  "[H]ad Dumas been able to acquire the property, they would have foregone advance."

1    4/24 Tr. Transcript 110:9-15.

2        82.  Mr. Souza testified that it was a mistake on his part

3    not to state that Dumas is excluding any advance from the

4    calculation.  He never notified the US that he had made the

5    mistake.  4/24 Tr. Transcript 110:14-19.

6        83.  At trial, Darrell Souza claimed that Glen D. Bell spoke

7    to him telephonically concerning the purported advance that Dumas

8    claimed was made under the Deed of Trust.  The Court sustained a

9    hearsay objection to this testimony.  4/25 Tr. Transcript 78:10 –

10   82:15.  If this conversation did occur between Darrell Souza and

11   Glen D. Bell, it would have occurred prior to Mr. Bell's 2004

12   death but before the 2005 Souza Declaration in which  Mr. Souza

13   stated the principal balance was $251,112.49 .  Presumably Mr.

14   Souza would have taken into account any and all loan advances

15   when he finalized his declaration.

16   S.   DOJ ACCEPTANCE OF OFFER (SEPTEMBER 2005)

17       84.  Eventually, an offer by Dumas to pay $375,000 was

18   accepted by the Department of Justice on behalf of the Attorney

19   General, in a letter dated September 9, 2005.  Ex. 32, Letter of

20   Acceptance.

21       85.  The Letter of Acceptance states:

22       We have received your offer of April 14, 2004, on behalf of
         your client, Dumas International, to purchase the subject
23       property in a private sale in the above-referenced case.
         We understand your offer to be as follows:
24           1. Dumas offers to the United States in the amount of
             $375,000 (the "settlement payment") in exchange for the
25           United States' interest (relating to the tax
             liabilities of Glen D. Bell) in the Bell Ranch.
26
     Ex. 32, p. 1.
27
         86.  The Letter of Acceptance also provides for payment
28

                                  19

date: "The settlement payment would be paid within 90 days after acceptance of this offer, if any, assuming court approval."  Ex. 32, p. 1

87.   Paragraph two of the Letter of Acceptance, specifically, sets forth the risks:

> 2. If the offer is accepted by the United States, the United States would cooperate in requesting Court approval of the offer as a private sale under 28 U.S.C. § 2001. However, Dumas would be responsible for all expenses required by § 2001(b), including but not limited to, payment for the three appraisals and the advertisement of the Court hearing.  *Dumas bears the risk that the Court may accept an overbid for the Bell Ranch.*

Ex. 32, ¶ 2 (emphasis added).  Paragraph 2, specifically states that the Court <u>could accept an overbid</u> over Dumas's offer, and Dumas is <u>expressly notified of this risk</u>.

88.   The Letter of Acceptance concludes with: "This offer has been accepted on behalf of the Attorney General."  Ex. 32, p. 2.

89.   Dumas had already deposited $375,000 with First American Title in December 2004.  The deposited funds were payable to the IRS, "upon completion of a court ordered sale of the [Bell Ranch] property to Dumas International."  Ex. 15.

T.   <u>JEANETTE BELL'S BANKRUPTCY SCHEDULES (MARCH 2006*)*</u>

90.   Jeanette Bell's bankruptcy petition and schedules filed on March 10, 2006 provide at page US 045 that the only secured claim on real property is in the amount of approximately $300,000.  Ex. 7, Jeanette Bell Bankruptcy Petition, Dated 3/10/2003.  3513 Kiernan Avenue address is the only property listed as unencumbered.  At page US 047, the summary lists secured claims against Jeanette's property in the amount of

20

$310,000.  Ex. 7 US 45 and US 47.

**U.   DUMAS'S BANKRUPTCY PROOF OF CLAIM FOR LOAN (JUNE 2006)**

91.   Dumas completed on June 12, 2006, a Proof of Claim for the United States Bankruptcy Court, Eastern District of California for money loaned.  The value listed is $525,000.  Ex. 32, Proof of Claim.

92.   The debt was listed as secured and incurred as of 1984. Ex. 32.

93.   Mr. Souza, who signed the Proof of Claim, testified that the amount reflected the principle balance only of the initial construction loan and advance, and it was an approximation.  4/24 Tr. Transcript 130:4-25.

94.   He testified that he based his approximation on being told the principal was over $500,000, the two mortgage statements, the two separate notices of sale, the separate transfer documents and his memory.  4/24 Tr. Transcript 130:14-131:1-7.

**V.   $75,000 PAYMENT TO THE BELLS (FEBRUARY 2007)**

95.   Following the Government's September 9, 2005 acceptance of the Dumas offer, Darrell Souza in reliance on the September 2005 Letter of Acceptance, made two substantial payments to clear the way for a judicial sale of Bell Ranch.  Mr. Souza testified that he paid $75,000 to Jeanette Bell and Wayne Bevins for a complete relinquishment of their interests in the Bell Ranch property.  $25,000 was paid to Mr. Bevins and $50,000 was paid to Ms. Bell.   This removed the last remaining obstacles to a sale of the property.

96.   The separate release of funds and sales agreement

21

("Separate Release of Funds and Sales Agreement") between Jeanette Bell and MedCal LLC, affiliate of Dumas, dated January 24, 2007, states that an additional $50,000 remains in an escrow account and is to be released to Jeanette Bell "upon MedCal LLC receiving Wayne Bevins ownership portion of title." Ex. 35, Separate Release of Funds and Sales Agreement. The Separate Release of Funds and Sales Agreement also references a prior agreement of November 20, 2006 between MedCal LLC and Jeanette Bell. *Id.* This agreement was not put into evidence by the parties.

**W.   <u>DUMAS'S THREE APPRAISALS OF BELL RANCH ($7,500)</u>**

97.   Dumas contends that in reliance on the September 2005 Letter of Acceptance, from the US, it obtained three appraisals of the Bell Ranch property to assist in the sale process, for a total cost of $4,500.

98.   Mr. Souza testified at trial that the appraisals ranged between $730,000 to $770,000.

**X.   <u>DUMAS LETTER TO MR. JENNINGS, U.S. DEPT. OF JUSTICE (FEBRUARY 2007)</u>**

99.   On February 21, 2007, a year and half after the US accepted the Dumas's offer (September 2005), Mr. Souza wrote a letter to the US.   The letter was written on behalf of MedCal LLC, an affiliate of Dumas, to Mr. Jennings, at the U.S. Department of Justice concerning the sale of the Bell Ranch. Ex. 36, Letter to US Department of Justice from Souza, Dated 2/21/2007.

100.   The letter stated that MedCal LLC acquired 100% ownership in the Bell Ranch and it wished to obtain release of

the government liens.  Mr. Souza also stated, on behalf of MedCal LLC that it was "ready to pay fair market value" and could wire the funds immediately to expedite releases once an agreement had been made on the amount due.  Ex. 36.

101.  Mr. Souza testified at trial, that he was told thereafter by Mr. Jennings that it was too late, the decision was made by his bosses, and the government was going forward with a public sale.  4/25 Tr. Transcript 64:22:65:2; 124:20-24.

102.  Mr. Souza testified that he was not pleased about hearing the government was going forward with a public sale after Dumas spent six years taking the risk, spending hundreds of hours on the transaction, and negotiating a settlement with the Bells to stop filing bankruptcy filings.  4/25 Tr. Transcript 65:3-13.

103.  Mr. Souza believed he had an agreement with the government, and he would not have purchased Ms. Bell's and Mr. Bevin's interest for $75,000, nor sent over $75,000 to First American Title.

104.  Mr. Souza also believed that Dumas would get the approximately $850,000 if there was an overbid in the judicial public sale.  4/24 Tr. Transcript 125:12-19.

Y.  <u>JUDICIAL NOTICE OF SALE (MARCH 2007)</u>

105.  A judicial public sale was ordered by this court to take place on March 7, 2007, a month after Mr. Souza sent the letter to the Mr. Jennings.  The Judicial Notice of Sale stated: "The court has approved and authorized the Internal Revenue Service Representative to accept the minimum offer bid of $857,956.74 to Dumas.  Ex. 25a, Judicial Notice of Sale, Dated 3/7/2007.  "A subsequent bidder must offer at least ten (10) per

23

cent more than the minimum bid at the sale in order to purchase the property". *Id.* The notice specifically states that an overbid is possible, if a bidder offers 10% over the pre-approved $857,956.74, offered by Dumas.

106. The Judicial Notice of Sale states that the "government reserves the right to reject any and all bids and to withdraw the property from sale." *Id.*

107. The Judicial Notice of Sale also states that the "Sale is free and clear of the liens or interests of all defendants [the Bells] and of the United States, and any persons obtaining a purported interest after the notice of federal tax lien recorded January 24, 1990." *Id.*

108. Mr. Souza testified he believed the Judicial Notice of Sale replaced the old agreement. He also testified that he believed the Judicial Notice of Sale indicates that Dumas is to receive $857,000 in the public auction, if there was an overbid. 4/25 Tr. Transcript 67:5-18; 68:7-9; 73:18-20.

` 109. Mr. Souza assumed that as of February 2007 and March 2007, the principal balance of the initial construction loan and advance loan, coupled with interest was approximately $1,000,000. 4/25 Tr. Transcript 71:24-72:3.

Z. **SALE OF BELL RANCH (MARCH 2007)**

110. On March 7, 2007, the United States sold at public auction to the highest bidder the Bell Ranch in order to pay the judgment entered in this action. Dumas bid $2,700,000. The successful bidders, the Endsleys, bid $2,710,000 and paid $280,000.00 of the purchase price to the United States Treasury. The remaining balance of the purchase price, some $2.4 million,

was deposited with the Court (the "Deposit").

AA.  **PARTIES STIPULATION TO PRIORITY OF LIENS**

111.  The parties have stipulated that (1) the Deed of Trust will follow and attach to the Deposit to the same extent and with the same priority that the Stockton Savings Deed of Trust had on the Bell Ranch and (2) the United States' federal tax liens.  The judgment lien against Glen D. Bell and Jeanette Bell in this action will also follow and attach to the Deposit to the same extent and with the same priority that it had on the Bell Ranch.

BB.  **UNITED STATES EXPERT, ALAN POBRE - AMOUNT DUE TO DUMAS**

112.  Alan Pobre, employed for the Internal Revenue Service for the last twenty years, as a revenue officer, with his current title being advisor technical services, was called as an expert for the US.  4/24 Tr. Transcript 147:4-18;154:20-23.  Mr. Pobre has an Bachelor of Science in Justice of Administration.  He has taught statistics at Stanislaus State University.  4/24 Tr. Transcript 148:2-6.  Mr. Pobre's cases, as a revenue officer, involve lien priority disputes.  He has had over 100 cases. 159:22-160:4.  Mr. Pobre routinely makes calculations using spreadsheets.  4/24 Tr. Transcript 147:23-24.

113.  Mr. Pobre has testified once before in court, and it was not testimony on the valuation of an adjustable rate note. 4/24 Tr. Transcript 154:24-155:5.

114.  Mr. Pobre stated that he relied on two documents to prepare calculations: (1) Exhibit 1, Mr. Souza's 2005 Declaration; and (2) Exhibit 5, Guaranty Bank Residential Lending Payoff Statement, dated 10/23/2003.  4/24 Tr. Transcript 153:2-10.  Mr. Pobre's testimony is limited to Exhibit 5, Guaranty Bank

25

Residential Lending Payoff Statement, dated 10/23/2003.  4/24 Tr. Transcript 155:11-20.  He has not reviewed or seen the two residential mortgage loan statements from December 2003, which state different amounts.  4/24 Tr. Transcript 155:21-24.

115.  Mr. Pobre testified that Mr. Jennings wanted him to figure out how Mr. Souza reached $482,000, the total amount due that is listed in Mr. Souza's 2005 Declaration.  4/24 Tr. Transcript 153:11-15.  He therefore amortized the value of $310,000 Adjustable Rate Note to March 1, 2015, and the value is more or less $482,000.  4/24 Tr. Transcript. 153:16-23.  He does not know the basis for calculations in Exhibit 1, Mr. Souza's 2005 Declaration.  4/24 Tr. Transcript 154:3-5.

116.  Mr. Pobre  calculates the total balance due on the Bell loan, with principal, interest, and penalties as of May 1, 2008 to be $499,999.46.  This is the amount the US contends is owed to Dumas from the proceeds of the sale of the Bell Ranch.

117.  Mr. Pobre created a spreadsheet using the COFI index rates prior to learning of the deposition of Kathryn Lewis, Stockton Savings Bank employee.  4/24 Tr. Transcript 148:16-149:8; Ex. 17, United States Calculation of Mortgage Balance.

118.  Mr. Pobre's spreadsheet schedule, calculating the amount owed to Dumas, is consistent with the testimony of Kathryn Lewis, Stockton Savings Bank employee deposition testimony that the principal loan balance as of August 1996 was $267,429.05, Ex. 9, Depo. Lewis, 73:19-21, and Guaranty Bank Residential Lending Payoff Statement of October 23, 2003, where the principal balance for November 1, 1998 was $251,112.49.  Ex. 5, Guaranty Bank Residential Lending Payoff Statement, Dated October 23, 2003.

119.   Mr. Pobre's calculations freezes the principal balance from November 1988, at $250,000 and assumes no further payments were made on the loan.  4/24 Tr. Transcript 152:2-10.

120.   Mr. Pobre testified that freezing the balance as of November 1988 benefits Dumas as it does not reduce the principal balance and the loan continues to accrue interest at the COFI index rates.  4/24 Tr. Transcript 152:11-15.

121.   Mr. Pobre, testified at trial, after viewing the two December two mortgage statements for the first time, that he would conclude that the change in loan number between the two statements involved a recomputation of the loan, with a changed interest rate.  4/24 Tr. Transcript 160:12-18.

122.   Mr. Pobre testified that in order for him to amortize an advance, he would require a note to provide the terms, including when the note started, which he does not have with the residential mortgage loan statements.  4/24 Tr. Transcript 161:8-12.

CC.   <u>DUMAS EXPERT, RICHARD GOLDSTEIN, CPA - AMOUNT DUE DUMAS</u>

123.   Mr. Goldstein, retained by Dumas, is a Certified Fraud Examiner and Certified Public Accountant.  He received a Bachelor of Science in Business Administration in 1989 from California State University, Stanislaus.  Ex. 37, Report of Richard L. Goldstein, Dated April 16, 2008.  He states that he has fifteen years experience in accounting, financial management and consulting.  *Id.*

124.   Mr. Goldstein has experience assisting individuals and entities in preparing financial statements to obtain loans and experience in valuing notes and deeds of trust.  4/24 Tr.

Transcript 133:9-14.  He has prepared forecasts, budgets and profits/cost analyses for Fortune 500 subsidiary and was an Assistant to Controller for a wholly owned subsidiary of a Fortune 500 company.  Ex. 37

125.  He has been qualified as an expert witness and testified as an expert witness in State Superior Court, Bankruptcy Court, and before the Department of Worker's Compensation.  *Id.*

126.  Mr. Goldstein has been employed in various positions, including as CPA, Financial Analyst, Assistant to Comptroller, and a Senior Staff Accountant.  *Id.*

127.  Mr. Goldstein has been retained to render an opinion as to the value of the Deed of Trust interest in Dumas in relationship to the Bell Ranch.  4/24 Tr. Transcript 133:19-22.

128.  Mr. Goldstein, testified that the total amount owed under the two loans secured by the Deed of Trust, recorded against the Bell Ranch, amounts to $1,034,011, as of April 25, 2008, for unpaid principal and accrued interest.  Ex. 37

129.  In coming to his conclusion in the calculation of the present value of the Adjustable Rate Note and Deed of Trust, he reviewed several documents, including, Deed of Trust, Adjustable Rate Note, Guaranty Bank Residential Lending Payoff Statement, Assignment of Deed of Trust between Dumas and Guaranty Bank, Guaranty Bank, Residential Mortgage Loan Statements, dated December 9, 2003 and December 15, 2003, Deposition of Ms. Lewis, Stockton Savings Bank employee, and Deposition of Mr. Souza.

130.  He testified that he examined certain documents, including the payoff statement, the two residential mortgage loan

28

statements, one with the same loan number but with "ADV" behind it and it appears there is an advance loan.  4/24 Tr. Transcript 134:11-13.

131.  Based on his experience of completing 70 to 80 tax returns a year, and reviewing numerous loan documents, it appears that advancing money this way is the type of activity that loan companies do when lending.  He testified that in construction loans, that many times there are advance loans.  4/24 Tr. Transcript 134:14-23.

132.  He states in regards to a second loan, advance:

> The second loan is an advance with an annual interest rate of 10%.  This rate is documented by a statement from Guaranty Residential Lending dated 12/15/2003. The current principal balance at the statement date is $326,726.73.  The interest rate per day at 10% is approximately 0.274%.  There are 1,593 days from the date of the Guaranty Residential document to April 25, 2008.  Multiplying the number of day (1,593) by the interest per day (.0274%) yields a simple interest amount for this period of $142,498.

Ex. 37.

133.  Mr. Goldstein bases his opinion on several factors, including that the interest rates on the two residential mortgage loan statements coincide with the prevailing rates for that time period of 1987-1989, which was about ten percent.  One mortgage loan statement states the interest is 10%, the other is COFI plus 2.25%, which is around 9.7% or 9.8%.  4/24 Tr. Transcript 136:18-24.

134.  Mr. Goldstein assumes the Costs of Index Fund, or COFI, is used by banks because it is less volatile than other indexes and it lags the market, and here, the COFI index coincides with the loan at 10%.  4/24 Tr. Transcript 140:16-23.

1    135.   Mr. Goldstein also relies on that fact that the Warda
2    note had a five-year balloon period, that according to the
3    documentation was probably paid off on time.   He also relies on
4    the fact that there is federal tax lien in place as of February
5    10, 1989.   His experience is that clients who have a tax lien
6    cannot obtain a loan until the lien is satisfied.   4/24 Tr.
7    Transcript 137:1-15.

8    136.   In terms of seeing advances, he has seen banks
9    document the advances different ways, and there is no generic
10   form or term for documenting the advances, such as through
11   different loan numbers or rolling balances into the prior
12   statement.   4/24 Tr. Transcript 139:13-19.

13   137.   Mr. Goldstein believes that there is a greater
14   likelihood that there was an advance than not.   4/24 Tr.
15   Transcript 138:2-5.

16   DD.   **ATTORNEY'S FEES**

17   138.   The Adjustable Rate Note contains an "attorneys fees"
18   provision whereby the lender shall be reimbursed for all of its
19   "costs and expenses" incurred in obtaining repayment of loan: "If
20   the Note Holder has required me to pay immediately in full as
21   described above [for being in default], the Note Holder will have
22   the right to be paid back by me for all its costs and expenses
23   not prohibited by applicable law.   Those expenses include, for
24   example, reasonable attorneys' fees."   Ex. 3, Adjustable Rate
25   Note, ¶ 7(E).

26   139.   The Deed of Trust also contains an "attorneys fees"
27   provision that entitles the lender to make disbursements for
28   "reasonable attorneys fees" in the event that the borrower fails

30

to make required payments under the Adjustable Rate Note. Ex. 4, ¶ 7. Such fees "become additional indebtedness" of the borrower, and bear interest at the rate set in the overlying promissory note. *Id.*

140. The attorney's fees provision in the Deed of Trust exists independently of the fees provision in the Adjustable Rate Note.

141. By virtue of its status as successor-in-interest to Guaranty Bank (and its predecessor Stockton Savings), Dumas is entitled to collect its attorneys fees and costs incurred in this litigation under the Deed of Trust.

142. A lender enforcing its lien may be entitled to reasonable attorney's fees, if local law also provides this interest or expense the same priority as the lien or security to which it relates. 26 U.S.C. § 6323(e)(3. Section 6323(e)(3) provides that: "If [a] lien imposed [by the government for taxes] is not valid as against a lien or security interest, the priority of such lien or security interest shall extend to-, ...(3) the reasonable expenses, including reasonable compensation for attorneys, actually incurred in collecting or enforcing the obligation secured." Attorney's fees contractually provided for in the trust deed and promissory note, provides the beneficiary to entitlement to recover such fees that are incurred to protect and enforce his or her secured obligation, and such award has equal priority status with principal amount of deed of trust. *Wutze v. Bill Reid Painting Service*, *Inc.*, 151 Cal.App.3d 36, 46, 198 Cal.Rptr. 418 (1984).

143. Dumas shall file its application for attorneys fees in

accordance with Fed. R. Civ. P. 54.

144.   Federal Rule of Civil Procedures provides: "A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages."  Fed. R. Civ. P. 54 (d)(2)(A).  Unless a statute or a court order provides otherwise, the motion must: be filed no later than 14 days after the entry of judgment; specify the judgment and the statute, rule, or other grounds entitling the movant to the award; state the amount sought or provide a fair estimate of it; and disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.  Fed. R. Civ. P. 54(d)(2)(B)(i-iv).

CONCLUSIONS OF LAW

A.   **JURISDICTION**

1.   This court has "federal question jurisdiction" over this civil action that arises "under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  This action arises under Section 6321 of the Internal Revenue Code of 1986 (26 U.S.C. or "I.R.C."), and Section 6323.  This court also has federal jurisdiction under 28 U.S.C. Section 1345.  "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."  28 U.S.C. § 1345.

2.   Venue is proper in the Fresno Division of the Eastern

32

District of California pursuant to 28 U.S.C. § 391(a) and (c).
The lien claims sought to be enforced cover property located in
the Eastern District of California. Defendant Dumas was doing
business in the Fresno Division of the Eastern District of
California at the time this case was filed and is subject to
personal jurisdiction in this District by virtue of its
conducting business with Plaintiffs in Stanislaus County,
California (the County of Defendant's incorporation and their
principal place of business), Eastern District of California,
where the transactions occurred.

B.    QUESTIONS PRESENTED

      3.    The first question is: What is the current balance due
on the Adjustable Rate Note and Deed of Trust held by Dumas?

      4.    The second related question is: Whether there is a loan
amount advanced under the Deed of Trust and if so, is it senior
in priority to the federal tax liens?

C.    PRIORITY OF FEDERAL TAX LIENS

      5.    Under Section 6321 of the I.R.C., unpaid taxes are "a
lien in favor of the United States upon all property and rights
to property" belonging to a taxpayer.  A lien is not valid
against any holder of a "security interest" until notice is given
as required by Section 6323(f) (*i.e.*, filing in the county
records).  Certain lien holders who record first are entitled to
protection from the statutory lien of 26 U.S.C. § 6321, as
defined in 26 U.S.C. § 6323.  Where the priority of the federal
tax lien is challenged by the holder of a security interest in
encumbered property, the relative priority of interests is
controlled federal law, by I.R.C. § 6323.  *United States v.*

*McCombs*, 30 F.3d 310 (2nd Cir. 1994).

     **6.**  Dumas contends an advance was made, and it was made before the Federal Tax lien attached.  US contends, if there was an advance, it was made following the completion of the Bells' residence.  If an advance was made, the related question of whether the advance is senior in priority to the federal tax lien is to be addressed.

     **7.**  The burden is on Dumas to prove by a preponderance of the evidence that it meets all the qualifications for priority status under I.R.C. § 6323.  *Rice Investment Co. v. United States*, 625 F.2d 565, 571 (5th Cir. 1980).

     **8.**  A "security interest" takes priority over a federal tax lien only when it is perfected under local law and only "to the extent that ... the holder has parted with money or money's worth..."  26 U.S.C. § 6323(a) and (h)(1).  The term "security interest" means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability.  26 U.S.C. § 6323(h)(1).

     **9.**  Nominal title to the Bells' real property was transferred away shortly after it was deeded to the Bells.  There is no promissory note to evidence a purported advance, as required under the Loan Purchase and Sale Agreement, nor was there evidence provided of the terms and secured status of any advance.

     **10.**  Dumas has submitted two residential mortgage statements from December 2003, however no witness testimony from a witness with personal knowledge established that the statements reflect

1   any advance for an initial construction loan or any other reason.
2   Nor is there any evidence when such a purported advance was made.
3   Mr. Souza has testified to two different time periods when an
4   advance might have arisen, before the federal tax lien and after
5   the tax lien.

6       11.   Dumas's September 15, 2008 own declaration filed in
7   December 2005 contradicts its claim of an advance, which was made
8   after the purported advance was made.   Under penalty of perjury,
9   Mr. Souza on behalf of Dumas declared that the outstanding
10  balance on the Adjustable Rate Note was $482,956.74, including
11  interest, escrow advances and late fees, as of May 10, 2005.   His
12  testimony that he made a mistake in adding or reflecting that
13  this amount does not include the purported advance, is not
14  sufficient to overcome the lack of objective evidence
15  establishing an advance was made or when it was made.   Dumas's
16  current claim that it has a claim of over $1,000,000 contradicts
17  this amount stated in the 2005 Souza Declaration and in the
18  various other statements and documents submitted for evidence.

19      12.   Mr. Goldstein's, CPA, calculations that there are two
20  loans, with the total secured by the Stockton Savings' Deed of
21  Trust recorded against the Bell Ranch of $1,034,011 as of April
22  25, 2005 for unpaid principal and accrued interest is not
23  supported by the underlying evidence.

24      13.   US's calculation of the amount due Dumas, is consistent
25  with (a) the Loan Purchase and Sale Agreement, Ex. 2; (b) the
26  2005 Souza Declaration, Ex. 1; (c) the 1999 Deposition of Kathryn
27  Lewis, Stockton Savings bank employee, who was knowledgeable
28  about the construction loan, Ex. 9; (d) the 2003 Guaranty Bank

35

1  payoff statement, Ex. 5; (e) Dumas's December 2004 Offer Letter

2  to the IRS, Ex. 15; and (f) The first mortgage statement, dated

3  December 9, 2003, referencing Loan No. 72888-000527-001, Ex. 6.

4      14.  None of these exhibits evidence that a second loan

5  advance was an amount equal to or greater than the original

6  construction loan and was made before the original claim of tax

7  lien was filed.

8      15.  None of the requirements for priority status under

9  I.R.C. § 6323 have been met.  The lien of a prior mortgagee is

10  limited to the principal amount of the lien at the time notices

11  of federal tax liens were filed (plus accruals) and a federal tax

12  lien is paramount to any advances made subsequent to such notice

13  (plus 45 days).  26 U.S.C. § 6323(d); *United States v.*

14  *Christensen,* 269 F.2d 624, 626 (9th Cir. 1959).  Section 6323(d)

15  provides that advances made 45 days after the filing of the

16  notice of federal tax lien are deemed protected in certain

17  situations.  26 U.S.C. § 6323(d).  However, as no advance has

18  been established by a preponderance of evidence, any discussion

19  on the priority of an advance over a federal tax lien is

20  unnecessary.

21  D.  **DUMAS: MOTION IN LIMINE - GOV'T ESTOPPEL**

22      16.  Dumas brought a motion in limine to estop the United

23  States from arguing that the Dumas's lien is less than

24  $857,946.74.  Doc. 253.

25      17.  Dumas claims the US "promised" Dumas would be paid that

26  amount in a Notice of Judicial Sale.  Ex. 25(a).  Dumas argues

27  that the United States entered into an agreement for a "private

28  sale" but that the United States did not deliver any title to

36

1  Dumas.   Dumas contends that the Judicial Notice of Sale

2  constituted an "offer" to compensate Dumas for its "loss" of the

3  private sale.

4       18.  Dumas argues that the Judicial Notice of Sale, Exhibit

5  25(a), constitutes an agreement with the United States of the

6  amount to which Dumas is entitled.   The Judicial Notice of Sale

7  states:

8              The court has approved and authorized the Internal
             Revenue Service Representative to accept the minimum
9              bid offer of $857,956.74 to Dumas.

10  Ex. 25(a).

11       19.  The Judicial Notice of Sale is not signed, but bidders

12  are referred to an IRS Property Appraisal and Liquidation

13  Specialist.   The Judicial Notice of Sale is directed to the

14  public and does not set forth any terms of any agreement between

15  Dumas and the United States.   Dumas submitted no evidence of

16  consideration for such an agreement.

17       20.  Under the doctrine of governmental estoppel, "[a] party

18  seeking to raise estoppel against the government must establish

19  [1] 'affirmative misconduct going beyond mere negligence'; even

20  then, 'estoppel will only apply where [2] the government's

21  wrongful act will cause a serious injustice, and the public's

22  interest will not suffer undue damage by imposition of the

23  liability.'"   *Watkins v. United States Army*, 875 F.2d 699, 705

24  (9th Cir. 1989).   After proving these two threshold requirements

25  are present, the traditional elements of estoppel must be

26  satisfied.   *Id.* at 709.   (1) The party to be estopped must know

27  the facts; (2) that party must intend that his conduct shall be

28  acted on or must so act that the party asserting the estoppel has

a right to believe it is so intended; (3) the latter must be
ignorant of the true facts; and (4) the relying party must rely
on the former's conduct to his injury.  *Id.*

21.  The first threshold question, whether there was
affirmative misconduct "require[s] an affirmative
misrepresentation or affirmative concealment of a material fact
by the government, ... although it does not require that the
government intend to mislead a party.  *Id.* at 707 (citations
omitted).  However, the government is not bound by the
unauthorized acts of its agents.  *Id.*

22.  The second threshold question involves weighing the
injustice to the aggrieved party against the possibility of
damage to the public interest.  *Id.* at 708.  "Even when
affirmative misconduct has been shown, the government cannot be
estopped unless its acts also threaten to work a serious
injustice and the public's interest will not be unduly damaged by
the imposition of estoppel."  *Id.*

23.  The United States seeks to enforce its tax liens
against the Bell Ranch.  A tax debtor's property is sold at a
public auction under 28 U.S.C. § 2001(a).  This Court approved an
unopposed motion for an order for a "private sale" under 28
U.S.C. § 2001(b).  Doc. 217.

24.  One of the Section 2001(b) requirements is: "Before
confirmation of any private sale, the terms thereof shall be
published in such newspaper or newspapers of general circulation
as the court directs at least ten days before confirmation.  The
private sale shall not be confirmed if a bona fide offer is made,
under conditions prescribed by the court, which guarantees at

38

least a 10 per centum increase over the price offered in the private sale."  The "private sale" provides for public notice and a chance of an overbid.

25.  An overbid was received in this case and was not matched or exceeded by Dumas.  Doc. 218.  The US argues that if Dumas objected to the terms of the private sale, it should have objected to those terms when the private sale was approved by the Second Amended Order of Judicial Sale, entered November 22, 2005.  Doc. 217.  The US made no promise to Dumas that it would compensate it for losing in the bidding process.

26.  Dumas received a copy of 28 U.S.C. § 2001 when it negotiated the statutory private sale.  4/25 Tr. Transcript 94:1-19.  The acceptance letter from the United States to Dumas concerning the private sale specifically warns that the procedure is subject to overbid.  Ex. 32, ¶ 2.  The only benefit Dumas obtained from the "private sale" agreement was to lock in a price which a competing bidder must exceed by ten percent.  The belief of Dumas that the United States must deliver the Bell Ranch to Dumas, despite the overbid, is not reasonable, nor is it stated in the Notice of Sale.  Dumas simply underestimated the economic demand for the Bell Ranch.

27.  The position of the United States is that the minimum bid in the Judicial Notice of Sale ($857,946.74 – Ex. 25a) includes the amount due on the Dumas Deed of Trust ($482,956.74 – Ex. 1) and the offer by Dumas to the United States ($375,000 – Ex. 32).  The difference between the Dumas offer of $375,000 and the $857,946.74 minimum bid in the Judicial Notice of Sale is $482,956.74.  The US argues that this is precisely the total

1   balance due in the sworn statement by Dumas at Exhibit 1.  Dumas
2   could credit-bid its lien amount and only pay cash of $375,000,
3   to complete the minimum bid amount.  All of this became moot when
4   an overbid was received.

5        28.  The IRS cannot settle cases which are assigned to the
6   United States Department of Justice.  26 U.S.C. § 7122(a).[2]  Even
7   if the IRS official intended to settle with Dumas, it had no
8   authority to do so during the time the case was handled by the
9   United States Department of Justice.

10       29.  Mr. Souza testified at trial that he believed that
11  according to the Letter of Acceptance, Dumas would pay the US for
12  the Bell Ranch but if the bid did not go through, the deal would
13  change and the US would pay Dumas $857,000.  Mr. Souza has no
14  Letter of Acceptance from the US to evidence an agreement for the
15  US to pay Dumas $857,000, if the bid did not go through.  4/24
16  Tr. Transcript 91:18-93:1.  Nor has any US representative so
17  testified.

18       30.  There was no misconduct by the US in this case.  There
19  is no act, omission, misrepresentation, or agreement with Dumas
20  beyond the Letter of Acceptance.  Ex. 32.  Dumas, despite a lack
21  of credible evidence, seeks to obtain a windfall under an
22  estopppel theory, to recover $857,946.74 on a loan for which it

23  _____

24        [2]  **(a) Authorization.--The Secretary may compromise any**
25  **civil or criminal case arising under the internal revenue laws**
    **prior to reference to the Department of Justice for prosecution**
26  **or defense; and the Attorney General or his delegate may**
    **compromise any such case after reference to the Department of**
27  **Justice for prosecution or defense.  26 U.S.C. § 7122(a)**
    **(emphasis added).**

28

**40**

1  paid $260,000.   There is no basis for estoppel against the US

2  here.

3         31.   Dumas's motion in limine is DENIED.

4  E.    US: MOTION IN LIMINE - PAROLE EVIDENCE

5         32.   The US brought a motion in limine to exclude evidence

6  of any purported loan advance under the parole evidence rule.

7  Doc. 251.

8         33.   Dumas argues that an advance was made after the Loan

9  Purchase and Sale Agreement was entered into, and should be

10 considered a subsequent transaction, not a prior or

11 contemporaneous transaction, and the parole evidence rule does

12 not apply.   Dumas also argues that the advance, if made, does not

13 contradict the Deed of Trust terms, since the Deed of Trust had a

14 future advance clause.

15        34.   The US argues that the Loan Purchase and Sale Agreement

16 between Dumas and Guaranty Bank, is an "integrated" contract,

17 *i.e.*, a final expression of agreement, with an integration

18 clause. Section 16 states: this agreement "constitutes the entire

19 agreement between the parties hereto with respect to the purchase

20 and sale of the Loan Documents, and supersedes any other

21 agreements..."  Ex. 2, § 16..

22        35.   The US argues that the evidence is clear from the Loan

23 Purchase and Sale Agreement executed by Dumas in 2003, that the

24 balance due in 2003 on the loan to the Bells was the total amount

25 of $384,907.59, of which the principal amount due was

26 $251,112.49.  Ex. 2, p. US 003.   It contends that Dumas directly

27 contradicts the terms of this written agreement when it argues

28 that additional principal was loaned before the federal tax liens

41

1  existed.  *Banco Do Brasil, S.A. v. Latian, Inc.*, 234 Cal.App.3d
2  973, 1000, 285 Cal.Rptr. 870 (1991), *rev. denied*, *cert. denied*,
3  504 U.S. 986 (1992).

4        36.  Parol evidence is a rule of substantive law that
5  applies to restrict the introduction of extrinsic evidence to add
6  to or alter the terms of an integrated written document.  Harry
7  D. Miller, 1 Miller & Starr California Real Estate § 1.60 at 159
8  (West 2000).  However, the parol evidence rule is considered to
9  be a rule of substantive law, not a rule of "evidence" and so is
10 applied by federal courts and applied in accordance with state
11 laws.  *Merchants National Bank & Trust Co. v. Professional Men's*
12 *Association*, 409 F.2d 600, 602 (5th Cir. 1969).

13       37.  46. Under California law:

14              Terms set forth in a writing intended by the parties as
                a final expression of their agreement with respect to
15              such terms as are included therein may not be
                contradicted by evidence of any prior agreement or of a
16              contemporaneous oral agreement.

17 Cal Code Civ.Proc. § 1856(a).  The terms set forth in a writing
18 may be explained or supplemented by evidence of *consistent*
19 *additional* terms unless the writing is *intended also as a*
20 *complete and exclusive statement* of the terms of the agreement.
21 Cal Code Civ.Proc. § 1856(b)(emphasis added).  Terms of an
22 agreement may be explained or supplemented by course of dealing
23 or usage of trade or by course of performance.  Cal Code
24 Civ.Proc. § 1856(c).  It is the court that will determine with
25 the writing is intended by the parties as a final expression of
26 their agreement with respect to such terms as are included
27 therein and whether the writing is intended also as a complete
28 and exclusive statement of the terms of the agreement.  Cal Code

42

Civ.Proc. § 1856(d).

38.   Generally, the parties' intent is revealed by nature and character of the agreement.  "The words used in an agreement are a primary source from which to glean the parties' intent." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas,* 116 Cal.App.4th 1375, 1389, 11 Cal.Rptr.3d 412 (2004).

39.   Under California's liberal parol evidence rule, because the parties dispute the intended meaning of the words in the Loan Purchase and Sale Agreement, extrinsic evidence must be referenced to show whether the Loan Purchase and Sale Agreement was reasonably susceptible to a particular meaning.

40.   "Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning. [Citations.]  Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face.  Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." *Morey v. Vannucci,* 64 Cal.App.4th 904, 912, 75 Cal.Rptr.2d 573 (1998); *see also Davidson v Welch*, 270 Cal App 2d 220, 75 Cal Rptr 676 (1969) (In order to determine initially whether the terms of *any written instrument* are clear, definite, and free from ambiguity, the court must examine the instrument in the light of the circumstances surrounding its

43

1  execution so as to ascertain what the parties meant by the words
2  used, and only then can it be determined whether the seemingly
3  clear language of the instrument is in fact ambiguous).

4      **41.  US motion in limine is DENIED.**

5  **F.    CONCLUSION**

6      **42.  The Loan Purchase and Sale Agreement provides for**
7  **future advances, however no persuasive evidence was submitted by**
8  **Dumas that there was any such advance, and if there was an**
9  **advance that it was issued prior to the recording of federal tax**
10 **lien claims in 1989.**

11     **43.  Dumas has not proved by a preponderance of evidence the**
12 **validity of its claim under the Deed of Trust for amounts alleged**
13 **advanced by a lender under the Deed of Trust.**

14     **44.  The balance due on the Adjustable Rate Note and Deed of**
15 **Trust as of May 1, 2008, was $499,999.46.  The United States**
16 **shall calculate the additional accrued interest to the date of**
17 **the entry of these Findings of Fact and Conclusions of Law, and**
18 **submit a proposed order directing the Clerk of the Court to**
19 **distribute that sum to Dumas, with the remainder to be**
20 **distributed to the US to apply to the Bell tax debt.**

21     **45.  Dumas shall further recover its attorney's fees and**
22 **costs.**

23                          **CONCLUSION**

24 **1.   Defendant Dumas shall recover $499,999.46, plus,**
25      **additional interest to the date of the entry of these**
26      **Findings of Fact and Conclusions of Law, and attorney's**
27      **fees and costs.**

28 **2.   Defendant U.S. motion in limine is DENIED.**

                          **44**

1       **3.    Plaintiff Dumas motion in limine is DENIED.**

2       **4.    Plaintiff shall lodge a form of judgment with the court**

3               **within five days following service of these findings.**

4

5   IT IS SO ORDERED.

6   **Dated:    September 17, 2008          /s/ Oliver W. Wanger**
                                        UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**45**